**IT IS ORDERED as set forth below:**

**Date: December 21, 2021**

_____

**Jeffery W. Cavender**
**U.S. Bankruptcy Court Judge**

_____

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| In re: **VIRTUAL CITADEL**, *et al.*, <br> Debtors. | Case No. 20-62725-JWC <br> Chapter 11 |
| **THOMAS SWITCH HOLDING, LLC,** <br><br> **Plaintiff,** <br><br> v. <br><br> **BAY POINT CAPITAL** <br> **PARTNERS II, LP,** <br><br> **Defendant.** | **Adversary Proceeding** <br> **No. 20-06146-JWC** |

### <u>MEMORANDUM OPINION</u>

The Plaintiff, Thomas Switch Holding, LLC ("Thomas Switch" or "Plaintiff"), initiated this adversary proceeding by filing a Complaint to Determine Extent of Lien on Proceeds in Escrow against the Defendant, Bay Point Capital Partners II, LP ("Bay Point"), on July 15, 2020.

1

The Court held a trial on the Complaint beginning August 18, 2021, and concluding August 25, 2021.[1]  The Court hereby enters the below findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure:[2]

## I.  FINDINGS OF FACT

Based on the stipulations and the evidence presented at trial, including the testimony provided and the exhibits admitted, the Court makes the following findings of fact:

### A.  **The Debtors, the Property, and the Bankruptcy Case**

Prior to his untimely death in late 2019, Michael L. Oken ("Mr. Oken") owned and operated Virtual Citadel, Inc. and related companies (collectively, the "Debtors"), which operated two primary businesses: (1) a Bitcoin mining operation,[3] and (2) a data storage center.

The Bitcoin mining operation was on real property located at 0 Godby Road, Atlanta, Georgia, 30349 (the "Mining Property").  The Mining Property was owned by Debtor Godby-DC 5, LLC ("DC5").  Although it has an Atlanta address, the Mining Property is in the City of College Park and receives its electrical power from the City of College Park.

The data center was located on real property adjacent to the Mining Property (the "Data Property").  Though adjacent to the Mining Property, the Data Property was owned by a different Debtor entity, sits in the City of Atlanta, and receives its electricity from Georgia Power.

After Mr. Oken's death, Marshall Glade was appointed as receiver of the Debtors' assets, including the Mining Property and the Data Property.  Mr. Glade later became the restructuring

---

[1] The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 1334 and 157(a).  The Court has jurisdiction to enter a final judgment in this matter pursuant to 28 U.S.C. § 157(b)(2)(K) & (O).

[2] To the extent any finding of fact may be construed as a conclusion of law, it is hereby adopted as such.  To the extent any conclusion of law may be construed as a finding of fact, it is hereby adopted as such.

[3] In overly simplified terms, Bitcoin mining is the process in which specialized computer equipment solves complex math problems to create new blocks in the Bitcoin block chain.  The owner of the equipment that solves each block is rewarded with new Bitcoin.  Bitcoin mining is one type of cyptocurrency mining.

officer for the Debtors, and each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in February of 2020. The Debtors' bankruptcy cases were jointly administered in Case No. 20-62725, In re Virtual Citadel, *et al.* (the "Bankruptcy Case").

During the Bankruptcy Case, the Debtors sold substantially all their assets (the "Sale"), including the Mining Property and the Data Property, to Arkhos Property Group Holdings LLC (the "Purchaser") for a purchase price of $4,900,000. The Sale was approved by this Court by an order entered in May of 2020 [Bankr. Case Doc. No. 145], and the Sale closed in June of 2020. The deeds transferring the Mining Property and the Data Property to the Purchaser both contain stamps showing transfer taxes paid in the amount of $2,450 for each property.

### B. **Thomas Switch and Bay Point**

In early 2019, Thomas Switch loaned $545,000 to Mr. Oken and DC5. The Thomas Switch loan was secured by a perfected first-priority lien on the Mining Property.[4] Bay Point was a secured lender of the Debtors also and, by the time of the Sale, held a perfected first-priority lien on all assets of the Debtors other than the Mining Property. The upshot is, at the time of the Sale, Thomas Switch held a secured claim in first position on the Mining Property while Bay Point held a secured claim in first position on all other assets of the Debtors.

The Sale documents did not allocate the purchase price among the assets sold. Thus, it was not clear at the time of the Sale how much of the Sale proceeds should be allocated to the Mining Property and paid to Thomas Switch. Instead of delaying the Sale to answer that question, the order approving the Sale required the Debtors to escrow $700,000 of Sale proceeds pending the determination of the amount of Thomas Switch's lien. Thomas Switch's lien attached to the

---

[4] The parties disagree whether Thomas Switch had a valid, first-priority lien on certain personal property related to the Mining Property, but the Court need not decide whether Thomas Switch's lien extends beyond the real property to decide this case.

$700,000 up to the value of the Mining Property at the time of Sale.  Thomas Switch filed this adversary proceeding soon after the Sale closed to determine the value of its lien.  At the time of trial, the outstanding claims of Thomas Switch and Bay Point each exceeded $700,000.

### C.  <u>The Mining Property and Power Sales Agreement</u>

The Debtors purchased the Mining Property in 2017 for $50,000.  Zoned for a variety of commercial and light industrial uses, the Mining Property consists of .826 acres, or 36,002 square feet.  Located at the Mining Property are several "antboxes," which house machines that mine Bitcoin.  It is also improved with a 3,000 square foot "butler building," a basic metal building on a concrete slab, which houses electrical equipment that services the antboxes.  The only road access to the Mining Property is through the Data Property.  Though small and without direct road access, the Mining Property was essential to the Debtors' operations because it had access to 15 megawatts of electricity to power the Bitcoin mining operation.

Before the Debtors started mining Bitcoin, Mr. Oken hired Kenneth Baudry, an electrical engineer, to help market the data center.  After receiving calls for use of the data center for cryptocurrency mining, they learned cryptocurrency mining machines quickly used up the electrical capacity at the Data Property.  The cryptocurrency mining business is dependent on low-cost energy, and it was too expensive to increase the power capacity of the Data Property through Georgia Power.  Mr. Oken somehow realized he could get power through the City of College Park at the Mining Property at cheaper rates, and he hired Mr. Baudry to help engineer and design the electrical systems on the Mining Property to operate a Bitcoin mining facility.

In early 2018, Debtor Virtual Citadel, Inc. (the "Customer") entered into a Power Sales Agreement with College Park for a term of 5 years, though it was terminable upon 30 days written notice by either party.  The Power Sales Agreement contemplated providing up to 15 megawatts of electrical capacity to the Mining Property, which is significantly more electrical capacity

4

available at other commercial and industrial sites.  Both parties' expert appraisers confirmed that 15 megawatts of electrical capacity is unique, in the truest sense of the word, and neither appraiser found similar properties with capacity close to 15 megawatts.  The Power Sales Agreement also provided the electricity would be sold to the Customer at rates somewhere between 33-50% of the rates charged by Georgia Power, which could save $4 million per year on electrical costs at the maximum capacity.

Establishing access to 15 megawatts, however, was expensive.  To accommodate the increased capacity, the Power Sales Agreement required installation of additional above-ground infrastructure specified on Exhibit B to the Power Sales Agreement.  The Customer was obligated to pay for such above-ground infrastructure, but it would be owned by College Park.  The Debtors had the above-ground infrastructure installed on the Mining Property at a cost of approximately $885,000.

The above-ground infrastructure includes 6 transformers bolted onto concrete pads that hypothetically could be removed by College Park, but no evidence was presented at trial that College Park is likely to terminate the Power Sales Agreement or remove its infrastructure at any point.  In fact, the parties stipulated that College Park "will continue to extend the same amount of high power/electricity at the same discounted rates as that provided in the aforementioned Power Sales Agreements to any future owner of the real property located at 0 Godby Road, Atlanta, Georgia, 30349."  [Additional Stipulation of Facts, ¶ 8].

The College Park-owned infrastructure was not the only expense the Debtors incurred to improve the electrical capacity at the Mining Property.   While the College Park-owned infrastructure brings electricity to the Mining Property, it does not distribute electricity throughout the Mining Property.  Mr. Baudry testified that within each transformer is a "D-mark," which marked the point of connection between the utility company and the customer and the point at

5

which ownership of infrastructure and equipment by College Park ended.  The Debtors constructed significant underground and above-ground improvements on the Mining Property on the Debtors' side of the D-Mark to distribute power on the Mining Property and to the antboxes.  Mr. Baudry testified the total cost of the improvements on the Debtors' side of the D-mark was approximately $3 million.

Further, the Power Sales Agreement provides that Customer would be responsible for installing "underground secondary conductors and facilities from any and all transformers to Customer's service entrance."  [Ex. P9, Sec. VI.4].  While neither party discussed this provision at trial, nothing in the Power Sales Agreement contemplates the underground conductors and facilities are owned by College Park.  And while it is not clear where the "Customer's service entrance" is located, where the "underground secondary conductors and facilities" are located, or whether they are included in the improvements estimated to cost $3 million, the Court nonetheless finds the provision at least supports Mr. Baudry's testimony that substantial underground improvements not owned by College Park were installed and necessary to utilize the 15 megawatts of electricity at the Mining Property.

The access to 15 megawatts at low rates proved to be a key driver of value in the Sale because the Purchaser was primarily focused on the Bitcoin mining business and wanted to install additional mining machines at the Mining Property, which was possible because of the excess power capacity available there.  According to Mr. Glade, the Purchaser was "willing to pay the negotiated purchase price of $4.9 million, so that they could bring in as many Bitcoin mining machines as they could and run a Bitcoin mining operation that would be supplemented by . . . the expansion of their data center capabilities . . . ."  [Tr. 228:7-12].  Mr. Glade further testified that "most" of the value in the Sale was in the Power Sales Agreement, that "there's a lot of intangible

6

value in there," and that the Power Sales Agreement was the biggest reason the Purchaser was interested in the Debtors' assets.  [Tr. 229:18; 236:17-18; 213:15-17].

### D.  <u>The Thomas Switch Appraisal</u>

Plaintiff submitted the expert testimony and appraisal report of J. Michael Easterwood, who valued the Mining Property as of May 1, 2020.  Mr. Easterwood testified about the three basic methods to appraise property—the sales comparison approach, income approach, and cost approach.  He testified that data available in the marketplace determines which method should be applied and that value must be analyzed in the context of the highest and best use of a property and the available data for that use.

He determined the Mining Property to be a special purpose property designed specifically for a use that required significant electrical capacity, that the 15-megawatt electrical capacity at the Mining Property is its most significant feature, and that the market generally does not have sites with the power capacity available at the Mining Property.

He determined the highest and best use of the Mining Property to be a cryptocurrency mining facility, both because cryptocurrency mining is uniquely capable of using the high electrical capacity available at the Mining Property and because cryptocurrency mining was the Mining Property's use at the time of his appraisal.

He could not find any comparable properties with anything close to 15 megawatts of electrical capacity or any cryptocurrency mining properties, so he determined the sales comparison approach would not be appropriate.  He also determined the income approach was not appropriate because there was no income to analyze.

He determined the cost approach was the most appropriate method to value the Mining Property, which estimates the cost to replace a property when insufficient market or income data is available to estimate value through sales comparisons or income.  He testified that a different

approach might be more appropriate for a different highest and best use if appropriate data were available.

To determine the value using the cost approach, Mr. Easterwood determined the cost to replace the land itself, the butler building, and the cost of bringing equivalent electrical capacity to the property, which included the cost of the transformers.  He determined the cost of the raw land to be approximately $60,000, the building and concrete slab to be approximately $100,000, and the cost paid to College Park to bring the electrical capacity to the Mining Property to be approximately $885,000.  After adding some soft costs like engineering and applying certain discount factors and depreciation detailed in his report, he valued the Mining Property at $830,000 on a cost basis.

He did not include the cost of the antboxes, switchgear (equipment in the butler building that distributes the electricity to the antboxes), and other equipment and personal property located at the Mining Property because he did not consider those to be costs related to the real estate.  He also did not consider the cost of the underground and other distribution improvements not owned by College Park because he was not aware of those improvements or their cost at the time of his appraisal.

Mr. Easterwood also did not consider the Sale in the Bankruptcy Case and the transfer taxes shown on the deeds transferring the Mining Property and Data Property to the Purchaser because the Sale occurred after his appraisal.  He testified he would have considered such information and would have tried to verify certain facts about the transaction had the Sale already occurred as of the date of his appraisal.  He also testified, however, that consideration of the Sale would involve more than simply reviewing the tax stamps on the deeds, and he could not say for certain what impact the information would have had on his appraisal.

8

### E.  **The Bay Point Appraisal**

Bay Point submitted the testimony and appraisal report of Jeff Miller, who valued the Mining Property as of October 6, 2020.  Mr. Miller considered the same three valuation methods—sales comparisons, cost, and income.  Like Mr. Easterwood, he determined the income approach was not appropriate because there was no income to analyze from the property.  While he testified to performing a cost approach valuation of some sort, focusing on the building and land without considering any equipment or personal property, it is not clear from his testimony or his report what value may have been determined using a cost approach.  He ultimately determined to use the sales comparison approach despite testifying that "[w]e started off doing lots of research trying to find similar properties to no avail.  It's a very unique type of property.  Tried even finding properties that just had a lot of megawattage and didn't . . . find anything."  [Tr. 170:17-21].  Mr. Miller determined the highest and best use of the Mining Property to be light industrial.

Mr. Miller did not consider the value of any electrical equipment or infrastructure improvements regardless of whether they were above-ground, below-ground, or fixtures because, in his view, it would be irrelevant to the value of the property.  He did not consider the electrical capacity to be relevant to his analysis because he considered it a super adequacy.[5]  He testified the cost of the electrical infrastructure and access to 15 megawatts  did not "contribute[] to an economic use that is recognizable," [Tr. 189:24-25] and that he believed the market for such improvements is "very limited" and "to . . . put value on that much equipment, even though it's attached to the land is . . . far beyond my expertise and is not something that I think the market would recognize." [Tr. 181:24-182:5].

---

[5] Though the definition of super adequacy was not well-developed at trial, Mr. Miller stated "it's a super adequacy to me that no one would probably want to pay for it because it's very rare because people don't need it."  [Tr. 187:13-15].

Mr. Miller testified that although appraisal regulations require consideration of the previous three years of history, he determined the Sale at issue in this case was "not a transaction that was worthy of reviewing or spending . . . time on" because the tax stamps were evenly divided between the Mining Property and Data Property. "So, we did not . . . dig into that at all." [Tr. 175:13-19].

Using several comparable properties with standard utility access, Mr. Miller concluded the value of the Mining Property with standard ingress and egress would have been approximately $240,000, but because he considered the Mining Property landlocked without access to a road, he concluded the total value of the Mining Property to be $48,000.

In Mr. Miller's appraisal report, he relied on the following extraordinary assumptions and hypothetical conditions in reaching a value:

    a. Extraordinary Assumptions

        i. That the subject property is landlocked, without any legal access. At the time of the bankruptcy, the subject property was under different legal ownership than the abutting property that provides legal access.

        ii. That the city of College Park's power agreement with the previous owner, with lower than market rates, is not assignable. That all six electrical 2500 KVA transformers are not permanently affixed to the subject land, are controlled by others, and will be removed at no cost to the property owner.

        iii. That all Antboxes, stair platforms, and personal property will be removed from the subject property at no cost to the owner.

        iv. The existing utilities of power, water, gas and internet will continue to be available to the subject property.

    b. Hypothetical Conditions:

        i. The subject is appraised as of the date of value, under the hypothetical condition it is only improved with a 3,000 square foot metal warehouse.[6]

[Ex. D1].

---

[6] The hypothetical condition appears on the cover letter to the appraisal report but does not appear in subsequent pages of the report.

F.  **Other Value Testimony**

Bay Point also offered the deposition testimony of Marshall Glade, as 30(b)(6) representative of the Debtors, as evidence of value.  Mr. Glade gave the following testimony:

> Q:  Do you have any idea of what the property itself served as collateral for Thomas Switch Holdings? Do you have any idea what that property itself would be worth without the power contracts?
>
> A.        . . . I think we had some folks look at it internally and estimate. I can't remember what we put on the schedules for it, but I think that the building itself was maybe anywhere from 25 to $40,000 just the structure, and then maybe the underlying real estate may be worth 20,000, so maybe you're talking about 60,000 of value there considering it's landlocked with little access. I think that's—I don't— I think that's my estimate.

[Tr. 214:21-215:7].  The Debtors performed no engineering studies on the Mining Property and had limited understanding or knowledge of the electrical infrastructure and improvements beyond the fact that infrastructure was in place and that College Park owned the transformers.  Further, Mr. Glade "didn't even think about the allocations amongst the various parcels" in connection with the Sale because he was focused on the total sale price of $4.9 million.  [Tr. 228:13-17].

II.        CONCLUSIONS OF LAW

A.  **The Issue**

The issue before the Court is straight forward—what was the value of the Mining Property as of the date of the Sale?  If it was more than $700,000, then Thomas Switch is entitled to all $700,000 in escrow, and Bay Point is entitled to nothing.  If the value was less than $700,000, Thomas Switch is entitled to the amount equal to the value of the Mining Property, and Bay Point is entitled to the balance.

B.  **Legal Standards**

The Court must determine the value of Plaintiff's secured claim "in light of the purpose of the valuation and of the proposed disposition."  11 U.S.C. § 506(a)(1).  The proposed disposition

11

or use of the Mining Property is easy: it was sold as one part of the Debtors' operating business. The total business sold for $4,900,000, but nothing in the Sale documents allocated the purchase price among the various assets sold.  The purpose of the valuation is to determine how much of the $4,900,000 should be allocated to the Mining Property to determine its value on the Sale date and, consequently, Thomas Switch's interest in the $700,000 in escrow.

Neither the Bankruptcy Code nor the Bankruptcy Rules assign the burden of proof in an action to determine the value of a creditor's interest in its collateral; instead, the "circumstances will dictate the assignment of the burden of proof on the question of value." *In re Dunson*, 515 B.R. 387 (Bankr. N.D. Ga. 2014).  As the party seeking to establish the value of its collateral, Thomas Switch has the burden to establish by a preponderance of the evidence the value of the Mining Property.[7]

**C.** **Allocation of the Sales Price**

One indication of value in this case would be evidence of the Purchaser's allocation of the purchase price to the Mining Property.  Evidence offered on this point was the transfer tax stamp on the deed conveying the Mining Property from DC5 to the Purchaser.  Thomas Switch argues this tax stamp proves the Purchaser valued the Mining Property at $2,450,000.[8]  Though no contrary evidence was offered by Bay Point, the face of the deed conveying the Data Property was

---

[7] *See In re Sneijder*, 407 B.R. 46, 55 (Bankr. S.D.N.Y. 2009); *In re Hampel*, 2000 Bankr. LEXIS 2059, 2000 WL 34441712, at *2 (Bankr. D. Kan. 2000) ("As numerous courts have held, . . . the ultimate burden of persuasion falls upon the claimant to demonstrate by a preponderance of the evidence both the extent of its lien and the value of its collateral."); *In re Fassinger*, 246 B.R. 513, 520 (Bankr. W.D. Pa. 2000) (holding that under § 506, "the ultimate burden of persuasion is upon the creditor to demonstrate by a preponderance of the evidence both the extent of its lien and the value") (*quoting In re Robertson*, 135 B.R. 350, 352 (Bankr. E.D. Ark. 1992)); *In re Buick*, 126 B.R. 840, 851 (Bankr. E.D. Pa. 1991) ("Throughout the Code, the burden of proving the 'validity, priority, and extent' of security interests lies upon the creditors asserting such interests.").

[8] Georgia law imposes a tax on conveyances of real property at 0.1% of the consideration or value of property conveyed.  O.C.G.A. § 48-6-1.  The warranty deed conveying the Property shows a transfer tax of $2,450, indicating, on its face, a purchase price of $2,450,000.  *See also* O.C.G.A. § 48-6-4(c) (providing the tax paid under 48-6-1 "shall be determined on the basis of written disclosure of the actual consideration of the interest in the property granted, assigned, transferred, or otherwise conveyed").

also stamped with a transfer tax of $2,450, and it appears the Purchaser simply divided the total purchase price equally among the two parcels.  It seems just as likely, if not more likely, such an allocation was done more for expedience than a legitimate allocation of value.  The Court concludes the transfer tax, alone, does not prove the Purchaser allocated $2.45 million in value to the Mining Property.

That said, the Court concludes the transfer tax stamp weighs in favor of a value higher than $700,000 and weighs heavily in favor of a value substantially higher than Bay Point's proffered value of $48,000.  No matter how expedient it may have been to evenly distribute the purchase price for transfer tax purposes, it is hard to rationalize a decision to indicate a purchase price over 3.5 times the real value, much less a purchase price over 50 times the real value.

The only other evidence of an allocation of the Sale price, arguably, is the testimony of Mr. Glade that most of the value paid by the Purchaser was in the Power Sales Agreement instead of the Mining Property.  Mr. Glade's testimony is of limited help, however, because he made crystal clear he gave no thought to the allocation of the Sale price.  Further, Mr. Glade gave no actual opinion on the value of the Power Sales Agreement other than generalized statements that "most" of the value resided there and that "there's a lot of intangible value in there."  [Tr. 229:18-22; 236:14-18].  Such generalized statements give no meaningful guidance for specific values and leave the Court to guess what "most" and "a lot" mean in the context of a $4.9 million purchase price.  Though Mr. Glade testified the Debtors internally estimated the value of the Mining Property at $60,000, nothing indicates these estimates had any connection with a Sale price allocation.  Further, it is unclear from the testimony when such an estimate was done, what the purpose of the estimate was, who performed the estimate, their qualifications, and what methodology was used.  For those reasons, and for other reasons discussed below, the Court gives very little weight to the Debtors' value estimate for the Mining Property.

13

### D. **Mr. Easterwood's Opinion**

The Court accepts the opinion of Mr. Easterwood as the best evidence offered at trial of the Mining Property's value at the time of the Sale.  The Court finds Mr. Easterwood's opinion more reliable than the other opinions for several reasons, but the primary reason is that his opinion is the only one that accounts for the 15-megawatt electrical capacity at the Mining Property and attempts to value the property with that feature in mind.

The Court accepts Mr. Easterwood's conclusion that the highest and best use of the Mining Property is a cryptocurrency mining operation because the proof is in the pudding.  The Debtors spent significant funds to bring 15 megawatts of power to the Mining Property specifically to use it as a Bitcoin mining facility.  Mr. Glade's testimony confirmed the Bitcoin mining operation and the capacity to expand mining operations was the main interest of the Purchaser.  The Purchaser continues to use the property as a Bitcoin mining facility.  To conclude the highest and best use is something other than cryptocurrency mining (or some other use capable of utilizing the available electrical capacity) simply ignores reality and disregards significant capital invested in, and still used at, the Mining Property.

The Court agrees with Mr. Easterwood's conclusion that the sales comparison approach is not an appropriate method of valuation because there are no comparable properties with 15 megawatts of electrical capacity or cryptocurrency mining operations, a fact confirmed by Bay Point's appraiser.  Likewise, neither appraiser considered the income approach to be appropriate.

The Court accepts Mr. Easterwood's use of the cost approach as the best method of determining value for such a unique property without adequate comparables, especially in the context of this Sale.   If the Purchaser (or any purchaser) wanted a property with similar electrical capacity (and rates) to power its cryptocurrency mining operation, it would, at a minimum, have to buy a property in the City of College Park (or another location with significantly cheaper rates

14

than Georgia Power), pay for the infrastructure necessary to bring the electrical capacity to such a property, and improve the property with a similar structure as the butler building to house necessary equipment.  These are the costs Mr. Easterwood accounted for in his valuation opinion, and Bay Point did not challenge the veracity of the costs relied upon by Mr. Easterwood or the depreciation and discount factors applied by Mr. Easterwood in his opinion.[9]

The Court further finds the substantial underground improvements on the Mining Property that distribute electricity on the Mining Property but which were not considered by Mr. Easterwood are also relevant to the value of the Mining Property.  The exact cost of these additional improvements and how much of them are part of the real property is not clear, but the total infrastructure improvements on the Debtors' side of the D-mark was estimated to be around $3 million, and the Court need not find a specific value given the circumstances of this case.  Given Mr. Easterwood's value opinion of $830,000 and the additional underground infrastructure not included in his opinion, the Court comfortably concludes the value of the Mining Property is higher than $700,000.

The Court rejects Bay Point's contention that Mr. Easterwood's designation of the Mining Property as a "special purpose property" was improper or invalidates the cost approach.  The unique nature of the Mining Property, its highest and best use as a cryptocurrency mining facility, the unnecessary loss of significant capital investment if the Mining Property were converted to some use not capable of utilizing 15 megawatts, and the lack of adequate comparable properties

---

[9] Prior to trial, Bay Point filed a Daubert motion seeking to disqualify Mr. Easterwood's expert testimony.  The motion objected, among other reasons, to a discount rate applied by Mr. Easterwood to the overall costs to account for certain risks associated with cryptocurrency mining.  The Court denied the Daubert motion, concluding, among other things, that objections to the discount rate were matters to be explored at trial and subject to cross-examination and rebuttal testimony.  While Bay Point preserved its objections raised in the Daubert motion at trial, Bay Point did not cross-examine Mr. Easterwood on his chosen discount rate or offer any evidence at trial to rebut the chosen discount rate. Further, the evidence and testimony admitted at the trial bolster's the Court's conclusion when it denied the Daubert motion that Mr. Easterwood did not conduct a valuation of the Debtors' Bitcoin mining business as argued by Bay Point.

or income are the reasons the Court agrees with Mr. Easterwood's use of the cost approach, not a strict application of one definition of special purpose property. The Court is not aware of any argument or reason the cost approach is reserved exclusively for special purpose properties, and the cost approach is the best method of valuation under the circumstances of this case.

The Court also rejects Bay Point's contention that Mr. Easterwood erroneously attributed the cost of the transformers and other infrastructure owned by College Park to the value of the Mining Property. Unlike antboxes, switchgear, and other equipment that can be moved by the property owner to a different location, the property owner cannot simply transfer the electrical infrastructure owned by College Park or the access to the electrical capacity to some other location. The access to the electricity is tied to the Mining Property itself (as is the Power Sales Agreement). The Court therefore accepts Mr. Easterwood's conclusion that the cost of infrastructure necessary to bring the electricity to the Mining Property is attributable to the property itself because any property owner would be required to pay the cost of similar improvements on a different property.

In sum, the Court accepts Mr. Easterwood's determination that the highest and best use of the Mining Property is the use for which the Purchaser bought it and for which it continues to be used: a Bitcoin or cryptocurrency mining operation. The Court accepts the cost approach to be the most appropriate method to value the Mining Property given the lack of adequate comparables and income. The Court accepts Mr. Easterwood's value opinion as the best evidence of the Mining Property's value as of the date of the Sale, but the Court also concludes the additional distribution improvements not included in Mr. Easterwood's report and opinion also contribute to the value of the Mining Property. Accordingly, the Court concludes the value of the Mining Property is at least $700,000.

### E.  **Mr. Miller's Opinion**

The Court does not accept the value opinion of Mr. Miller.  First, his reasons for ignoring the electrical capacity—that he considers it a super adequacy that "no one would probably want to pay for," that it does not "contribute[] to an economic use that is recognizable," and that there is little or no market for it—simply ignore reality.  The Mining Property was being used as a Bitcoin mining facility prior to the Sale.  Additionally, the Purchaser bought the Mining Property (among other assets) specifically to use as a Bitcoin mining facility and paid millions of dollars for the Debtors' Bitcoin mining operation.[10]  The evidence is clear the electrical capacity not only contributes to a recognizable economic use for which there is a market, but the capacity is crucial to that use.

Second, given the testimony that there were no similar properties to analyze, the Court cannot accept the decision to use the sales comparison approach using comparable properties with standard utility access as the best method to value the Mining Property.  Mr. Miller testified that he did not have the expertise to analyze the infrastructure and the use of the Mining Property as a cryptocurrency mining operation, but the answer is not simply to ignore the property's most prominent feature as though it did not exist.

Third, while the Court understands the reluctance to accept the transfer taxes on the warranty deeds at face value given the 50/50 split between the parcels, there was no legitimate explanation for ignoring the transaction completely.[11]  It is difficult to accept a value opinion of 1.96% of the presumptive purchase price of $2,450,000 on the face of the deed when no effort was

---

[10] Mr. Glade's testimony confirmed that the Purchaser's primary interest was the Bitcoin mining operation and its capacity to expand, and that the main driver of value and profitability was the availability of high-capacity electricity at cheap rates.

[11] Mr. Easterwood likewise did not consider the transfer tax issues, but his appraisal was performed prior to the sale of the Mining Property.

made to reconcile such a wide disparity, particularly when the deed in question was part of the very Sale under consideration in this case.

Finally, the Court does not accept the extraordinary assumptions employed in Mr. Miller's report, which artificially constrain the valuation to a set of circumstances that do not actually exist at the Mining Property.[12]  The Court need not detail each of its concerns, but the assumptions appear crafted to value the Mining Property not as it existed at the time of the appraisal or Sale but in a hypothetical world where it had never been developed into a Bitcoin mining facility.

## F.  **The Debtors' Opinion**

The Court also rejects the Debtors' value estimate (offered through the testimony of Mr. Glade) because, among other reasons, it failed to account for the electrical capacity.  It was clear Mr. Glade and the Debtors had limited knowledge of the electrical capacity and infrastructure located on the Mining Property other than that it existed and that the transformers were owned by College Park.  Further, the Court has no idea when the estimate was performed, by whom, or why. The estimate could have been a quick back-of-the-envelope liquidation estimate when Mr. Glade first took over the Debtors and had limited knowledge of their business.  As discussed above, Mr. Glade gave no thought to allocating a value to the Mining Property as part of the Sale itself, and the Court simply does not find the testimony reliable as an indicator of value as of the Sale date. The Court further rejects the opinion because it was given under the hypothetical condition that

---

[12] For example, the Court rejects any discount to the value of the Mining Property based on an assumed lack of legal access because such assumption is unwarranted and inconsistent with the reality of what existed pre- and post-Sale. While the Court cannot take issue with the assumption that the Data Property and Mining Property were owned by separate entities before the Sale, the Court rejects the conclusion that such a fact necessitates a finding of no legal access to the Mining Property.  Mr. Miller did not consider the fact that the separate legal owners were affiliates controlled by Mr. Oken prior to his death and then Mr. Glade at the time of the Sale, or that both parcels were owned by the same entity at the time of his appraisal.  He did not consider whether DC5 had access through the Data Property or whether easement rights might have existed.  He simply assumed no legal access because of separate legal ownership without any meaningful analysis.  On redirect, when asked whether his understanding was that two different debtors in bankruptcy owned the two parcels, he responded "Yes. Yes.  Well, I guess I did not spend a whole lot of time thinking about it.  I'm sorry."  [Tr. 194:8-9].

the Power Sales Agreement did not exist, [Tr. 215:22-24], and the Court does not accept the premise that all the value in the Bitcoin mining business resided in the Power Sales Agreement.

First, the Court is not persuaded the 15-megawatt electrical capacity has no value without the Power Sales Agreement because a new agreement could be reached with College Park as long as the infrastructure remains in place,[13] and there was no evidence to suggest the infrastructure will ever be removed by College Park.  The stipulated evidence before the Court was just the opposite, that College Park would continue to extend the same amount of high power/electricity at the same discounted rates as that provided in the Power Sales Agreements to future owners of the Mining Property.

Second, the premise focuses exclusively on the cheap rates available under the Power Sales Agreement while ignoring the access to electricity.  Access to high-capacity electricity is a pre-requisite to the value of the Power Sales Agreement, and the Mining Property is the only property with the access.  The evidence shows the Power Sales Agreement is inextricably tied to the Mining Property, and the Court questions how the Power Sales Agreement has any value independent of the Mining Property, not *vice versa*.  Even if the Power Sales Agreement has value independent of the Mining Property, that value must, at a minimum, account for the cost of improving some different parcel of property with the necessary infrastructure because no other property has it.  In short, the Mining Property's access to power has value, and without adequate comparable properties, the cost of re-creating the electrical access is the best estimate of value.

Third, the Court does not accept the premise that College Park's ownership of the transformers, its ability to remove them, or College Park's termination rights under the Power Sales Agreement destroy the value of the electrical access and infrastructure.  The premise again

---

[13] The Purchaser (or its affiliates) entered into similar Power Sales Agreements with College Park.  [Additional Stipulation of Facts, ¶ 7; Ex. D10].

relies too much on hypotheticals, but more fundamentally it ignores the fact that those same issues apply equally to the Power Sales Agreement.  If the transformers are removed or the Power Sales Agreement is terminated, then the Power Sales Agreement also has no value.  Yet, the Debtors' assets clearly had significant value as an operating Bitcoin mining operation regardless of the ownership of the transformers or termination rights, and no legitimate basis exists for excluding the electrical access the Mining Property provides from that value.

The premise offered by Bay Point requires the Court to ignore what occurred here: a sale of the Debtors' ongoing operations in which the Mining Property and its access to 15 megawatts was an integral, if not the most important, component.  Bay Point seeks a value as if the property was never improved for Bitcoin mining.  This is contrary to the directive of § 506 to value the collateral "in light of the purpose of the valuation and of the proposed disposition."  It also would require the Court to find that, after purchasing the Mining Property for $50,000 in 2017, and after spending millions of dollars on improvements to power their Bitcoin mining operation with 15 megawatts of electricity, the Mining Property somehow decreased in value by $2,000.  The Court does not need expensive computers performing complex algorithms to know that does not compute.

### F. <u>Conclusion</u>

Both the Power Sales Agreement and the Mining Property played critical roles in the Debtors' business operations, and both appear to have contributed significant value to the overall purchase price.  If the Court had to parcel out an exact value between the Mining Property and the Power Sales Agreement, the task would be difficult, but it is clear the Power Sales Agreement did not act as the sole reservoir of value independent of the Mining Property.  The Power Sales Agreement needs a property equipped to receive the power supply, and the Mining Property is the only available property properly equipped to do that.  If the Purchaser wanted a power supply at a

different property, it would have to pay for the improvements to get it. The cost of improving such a parcel would far exceed $700,000 according to the evidence presented at trial. Further, the Purchaser's chosen allocation of value between the Data Property and the Mining Property offers evidence that the Mining Property had a value greater than $700,000. Therefore, the Court concludes that Thomas Switch carried its burden of proof at trial and established that the value of the Mining Property on the date of Sale was no less than $700,000. The Court therefore concludes that Thomas Switch is owed the entire $700,000 held in escrow.

The Court will enter a separate judgment consistent with this Memorandum Opinion.

The Clerk is directed to serve a copy of this Memorandum Opinion on all counsel of record in this adversary proceeding.

### ###END OF ORDER###